**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

ELLEN M. RUMSEY,

                    **Plaintiff,**

v.                                       **1:12-CV-1534 (BKS/RFT)**

NORTHEAST HEALTH, INC. and ST. PETER'S
HEALTH PARTNERS,

                    **Defendants.[1]**
_____

**APPEARANCES:**

Cooper, Erving & Savage, LLP
Carlo A.C. de Oliveira, Esq.
39 North Pearl Street
Fourth Floor
Albany, New York 12207-2797
Attorneys for Plaintiff

Jackson Lewis P.C.
Matthew H. Woodard, Esq.
One North Broadway, 15th Floor
White Plains, New York 10601
Attorneys for Defendants

**Hon. Brenda K. Sannes, United States District Court Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.  INTRODUCTION**

      Plaintiff Ellen Rumsey was a teacher at The Samaritan Rensselaer Children's Center

("Children's Center), a child day care center in Troy, New York, from 2003 to 2011, when she

---

[1]On July 24, 2013, Senior United States District Court Judge Norman A. Mordue, to whom this action was assigned previously, *see* Dkt. No. 39 (Order of Reassignment), endorsed the parties' stipulation to the dismissal, with prejudice, of defendants: Deirdre Greco, Karen Tassey, James Reed, Joseph Brodzinski and Barbara McCandless. Dkt. No. 21. The Court has amended the caption accordingly.

was terminated. By all accounts, plaintiff provided exceptional care to the children in her classroom. But in December 2008 and January 2010, plaintiff received two corrective action notices, which she contends were unjustified, for allegedly inappropriate interactions with other staff members at the Children's Center. Her performance evaluations in 2008 and January 2010 indicated that staff had concerns about working with her. In November 2010, plaintiff wrote a letter to the New York State Division of Human Rights in support of a co-worker's pregnancy discrimination claim, and in March 2011 she participated in an internal investigation of that claim. In May 2011, her employment was terminated following a disagreement with a staff member.

Plaintiff claims that defendants Northeast Health, Inc.[2] and St. Peter's Health Partners[3] terminated her employment in retaliation for her participation in her co-worker's pregnancy discrimination case. As the individual defendants who were named in the complaint have been dismissed, only three causes of action remain:[4] retaliation in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e-3; retaliation in violation of New York State Human

---

[2]Northeast Health is a "comprehensive network of health care and community services in the Capital Region" of New York State. Dkt. No. 32-8, p. 6 (Northeast Health Staff Handbook). The Children's Center is "part of Samaritan Hospital . . . an affiliate within Northeast Health." Dkt. No. 33-9, pp. 8-9.

[3]Defendant St. Peter's Health Partners is the "successor by merger" to defendant Northeast Health, Inc. Dkt. No. 10 (Answer, ¶ 10). The Court refers to these defendants jointly as Northeast Health, which was the name of the corporation during plaintiff's employment.

[4]Plaintiff initially named defendants Deirdre Greco, Karen Tassey, James Reed, Joseph Brodzinski and Barbara McCandless as defendants in the second through sixth causes of action, alleging that they discriminated and retaliated against her in violation of N.Y. Exec. Law § 290. Dkt. No. 1 (Complaint). Because these defendants were dismissed from this action, see footnote 1, supra, and plaintiff did not name Northeast Medical or St. Peter's Health Partners as defendants in the second through sixth causes of action, those causes of action are dismissed and only the causes of action against Northeast Health (Title VII, NYSHRL, and breach of contract) remain.

Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290-301,[5] and breach of contract under New

York common law. Dkt. No. 1. Plaintiff seeks compensatory damages, including back pay and

front pay, punitive damages and attorneys' fees and costs. Dkt. No. 1. Defendants move for

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Dkt. No. 32.

Plaintiff opposes the motion. Dkt. No. 33. For the reasons that follow, defendants' motion is

granted.

## II.     FACTS

In August 2003, plaintiff applied for a position at the Children's Center. Dkt. Nos. 32-6;

33-3, pp. 75-76. After an interview, Deirdre Greco, the Director of the Children's Center, hired

plaintiff as a teacher. Dkt. No. 33-3, pp. 75, 77. Throughout the course of her eight-year

employment, plaintiff worked in an infant classroom under Greco's direct supervision. Dkt. No.

33-3, pp. 78, 91. In general, there were eight infants and two adults ("co-teachers") in each infant

classroom. Dkt. No. 33-3, p. 86-87. Plaintiff's co-teacher during the time period relevant to this

action was Mary Sheehy; they worked together for "close to six years." Dkt. No. 33-3, p. 92.

It is undisputed that plaintiff was an exceptional teacher. Dkt. No. 32-11. For example,

Greco rated plaintiff as "[c]onsistently EXCEEDS performance standards" in seven of her eight

annual performance appraisals. Dkt. No. 32-11. In plaintiff's 2003-2004 performance appraisal,

Greco commented that: "Ellen's work habits are terrific," she had "a great admiration for Ellen's

philosophy of working with children," and plaintiff's "respect for each child as an individual"

was a "good thing . . . to see each day." Dkt. No. 32-11, p. 5. In plaintiff's 2008-2009

performance appraisal, Greco praised plaintiff's "well-thought out philosophy of working with

---

[5]Although Northeast Health argues that, in light of the dismissal of the individual defendants, no NYSHRL claims remain, Dkt. No. 32-23, p. 8, the Court assumes, without deciding, that plaintiff intends to advance a retaliation claim against Northeast Health under the NYSHRL. *See* Dkt. No. 1, p. 20(A) ("Defendants Northeast Health . . . violated Title VII, the New York State Human Rights Law, and/or New York State common law.").

babies," and noted that the "babies in her classroom thrive [and] receive much physical and verbal attention." Dkt. No. 32-11, p. 29. Her performance evaluations, however, also reflected staff concerns about working with her. *See* Dkt. Nos. 32-11, p.25; 32-11, p. 30.

## A. First Corrective Action

Plaintiff testified that on December 12, 2008, a "terrible ice storm" downed trees, left traffic lights out and made the roads "impassable." Dkt. No. 33-3, pp. 120-21. After a "harrowing" ride to work, plaintiff told her husband, who had driven her, to wait while she checked to see whether the Children's Center was "going to stay open. Dkt. No. 33-3, pp. 120-21. Plaintiff testified that she found Greco and three other teachers, but no children, sitting in the middle of a classroom:

> And I opened up the door and I said, "Deirdre, are we going to stay open?" And she said, "Yes." And I said something to the effect, "It's like a combat zone out there." And I know I was visibly shaken. I know I was. And I said, "It's like a – " and she said, "I know" and she laughed.
> And I believed at the time she was laughing at me, and the state of me being visibly shaken. And I just said, "You're a lunatic" and I closed the door. And I told my husband to go on, and I went inside and did my job for the rest of the day.

Dkt. No. 33-3, pp. 121-22. Plaintiff subsequently apologized to Greco and the staff because she knew it was not "an appropriate thing to say." Dkt. No. 33-3, p. 125.

On Monday, December 15, 2008, plaintiff showed Greco a letter she planned to send to the Children's Center's Board of Directors. Dkt. Nos. 33-3, p. 128; 32-12, p. 4. In it she expressed her "displeasure" over the "unwise" and "irresponsible" decision to keep the Children's Center open on Friday, December 12, 2008 following the ice storm and during a "State of Emergency." Dkt. No. 32-12, p. 4. Plaintiff stated that Greco "scanned it and said, 'Well, that's fine'" and that she was "giving [her] a corrective action." Dkt. No. 33-3, p. 128.

Plaintiff testified that when she asked where the corrective action was, Greco responded that she had not written it yet.[6] Dkt. No. 33-3, p. 128.

Later that day, plaintiff received a "Corrective Action Notice." Dkt. No. 32-12, p. 2. It indicated that it was a "First Written Notice" for the incident on December 12, 2008, and the "Category of Infraction" checked was "Misconduct." Dkt. No. 32-12, p. 2. The "Description of Infraction" stated: "Ellen came into the morning room with myself, four teachers and a child. She was upset, said she hoped we would not stay open. [Greco] indicated that the Center was open. She angrily stated that 'You are a lunatic' and left." Dkt. No. 32-12, p. 2.

In an email to Joseph Brodzinski, Northeast Health's Director of Human Resources, dated January 14, 2009, plaintiff addressed the corrective action and requested documentation showing when Greco first contacted him "about the incident." Dkt. Nos. 33-3, p. 127; 32-12, p. 6. In the email, plaintiff explained that she "went to [Greco] with [her] letter to the Board BEFORE she gave me the written warning." Dkt. No. 32-12, p. 6.

In an email dated January 15, 2009, Brodzinski responded that it was not plaintiff's "concern what documentation" he had or when he received it, and that if she believed the "corrective action was retaliatory" and was "unhappy with the way" he had "dealt with this issue," she could "follow the chain of command process and speak with Barbara McCandless,"

---

[6] In a letter dated December 16, 2008, Paul Martin, Chair of the Children's Center's Board of Directors responded to plaintiff's letter, acknowledged plaintiff's concerns about the decision not to close Children's Center the previous Friday and commended her for "the efforts" she "made to overcome" the challenges of the weather conditions and report to work. Dkt. No. 32-21, p. 5.

Northeast Health's Vice President of Human Resources.  Dkt. Nos. 32-12, p. 6; 33-8, p. 104; 33-9, p. 6. [7]

**B.  Second Corrective Action Notice**

Plaintiff received a second corrective action notice following an angry exchange with "Heather," who was then the Children's Center's assistant director.  Plaintiff testified that one morning in early December 2009, Heather, came to their classroom and "started . . . telling [Sheehy] that she couldn't work Christmas week because she didn't sign up to work." Dkt. No. 33-4. p.  3. Plaintiff testified that Sheehy "was in the middle of changing a baby's diaper" and "looked confused and . . . unable to answer, so [plaintiff] started asking [the assistant director] questions." Dkt. No. 33-4, p. 3. Plaintiff stated that she asked: "What do you mean if we didn't sign up to work, we can't work? Generally it's you sign up to have the day off." Dkt. No. 33-4, p. 3. Plaintiff testified that later, she asked Greco "if she had given the [assistant director] the authority to change [their] internal policy" and that Greco responded that she had not. Dkt. No. 33-4, p. 3.

On or about January 7, 2010, Greco gave plaintiff a corrective action notice for this incident. Dkt. Nos. 32-12, p. 7; 33-4, p. 6. It indicated that it was a "Second Written Notice," and the "Category of Infraction" checked was "Other." Dkt. No. 32-12, p. 7. The "Description of Infraction" stated: "Inappropriate attitude and interaction [with] co-workers. Heather was speaking with Mary, the co-teacher in the [infant] classroom, about a staffing situation. Ellen angrily interrupted [and] criticized Heather. When Heather spoke to Ellen about it later, Ellen

---

[7]Although Brodzinski did not state when he made the recommendation, he testified at his deposition that he recommended that a "first written warning" should be given to plaintiff as a result of the incident. Dkt. No. 33-8, p. 24. Brodzinski explained he made this recommendation based on: "Inappropriateness of the conduct of Ms. Rumsey in front of other staff. I believe Greco was with babies at the time. I felt it was something that shouldn't happen. If it did happen it should have been behind closed doors." Dkt. No. 33-8, p. 25.

remained angry at first and then, later, apologized." Dkt. No. 32-12, p. 7. Plaintiff testified that she declined to sign the notice. No. 33-4, p. 1.

On January 8, 2010, plaintiff emailed Brodzinski about the corrective action:

> I'm not sure if you've heard from [Greco] yet . . . but we have a problem. I warned you to watch for retaliation against me, just as I was warned by a NE Health Parent. Yesterday [Greco] tried to give me a corrective action notice about a particular situation. I refused to accept it and requested we proceed only with you and Ms. McCandless in attendance. I categorically deny any wrong doing in this incident and have a witness to back me up. Furthermore, I received this without [Greco] performing any kind of investigation or fact finding. She never asked for my side of the story, or asked the third person in the room for her account of it. This is consistent in her dealings with me. When I'm called to her office, it's always to be accused rather than to have a conversation about what has taken place. Anyone can walk in, make an accusation about me, and she accepts it as fact.
>
> [Greco] cannot get to me based on my work performance, which she admitted yesterday is great. I feel she is using other avenues to try and build a case to have me fired. This is all in retaliation for me "going over her head." As I've told you ... [Greco] does not like to answer to anyone! If you are available today . . . to meet, I'd like to fill you in prior to our "group" meeting. I am prepared to take this as high up in the "chain of command" [as] I need to. I was railroaded last year, and will not let this happen again.

Dkt. No. 32-12, p. 8. Plaintiff testified that she believed Greco was retaliating against her because "just prior to" receiving the corrective action notice, she had contacted the Childcare Coordinating Council concerning a teacher at the Children's Center, who was taking a child development certification class, "did not have her high school diploma or GED and therefore was not eligible" for certification. Dkt. Nos. 33-3, p. 66; 33-4, p. 7.[8]

Plaintiff stated that she could not recall whether she and Brodzinski spoke about her email but that she next went to see McCandless. Dkt. No. 33-4, p. 140. Plaintiff testified that they discussed the "corrective action . . . that there was no incident . . . that it had been given to

---

[8]Plaintiff testified that over the course of her employment, she reported a number of issues to her superiors, including: a staff member's lack of proper credentials for her position, Dkt. No. 33-4, p. 75, alleged violations of the staff to children ratio, Dkt. No. 33-4, p. 76, a staff member sleeping on duty, Dkt. No. 33-4, p. 78, a child being left at a park, Dkt. No. 33-4, p. 78, and a staff member whose fingernails were too long. Dkt. No. 33-4, p. 83.

me without any fact-finding" and that Greco did not ask Sheehy "about what happened" until after she appealed the corrective action. Dkt. No. 33-4, pp. 12-13. Plaintiff stated that she also told McCandless that she disagreed with the first corrective action and wanted it overturned. Dkt. No. 33-4, p. 13. Plaintiff testified that McCandless told her that she "was an outcast amongst [her] peers" and declined to overturn the corrective action.[9] Dkt. No. 33-4, pp. 13-14.

### C. Performance Appraisal

On or about January 18, 2010, Greco issued plaintiff's 2008-2009 performance appraisal. Dkt. No. 32-11, p. 28. In the six prior performance appraisals, Greco had given plaintiff the highest rating possible: "Exceeds performance standards." Dkt. Nos. 33-3, p. 106; 32-11, pp. 2, 4, 9, 14, 19, 23. This time, however, Greco gave plaintiff a lower rating: "Fully MEETS expected performance standards." Dkt. No. 32-11, p. 28. In the appraisal, Greco stated that she felt plaintiff could improve her "[a]ttitude and skills with co-workers," that "[h]er relationships with other staff" could "be problematic" and staff members were "occasionally reluctant to offer or seek help in [plaintiff's classroom] as they do not feel the response will be respectful." Dkt. No. 32-11, p. 30.

Plaintiff testified that Greco told her that she received a "lower rating" for "gossiping." Dkt. No. 33-3, p. 107. Plaintiff explained that she had "reported that there was a possible sex offender outside of the center" at some point and that Greco deemed her report "gossiping." Dkt. No. 33-3, p. 110.[10]

---

[9]On January 25, 2010, plaintiff sent McCandless an email stating that she was "leaning towards appealing my corrective action notice" and that through her appeal she could, at least, "make upper management aware of the blatant disregard/lack of enforcement of the NE Health policies in my department." Dkt. No. 32-12, p. 10.

[10]Plaintiff stated that she had learned from an assistant teacher in her classroom that the man "had recently been released from prison for having relations with underage girls." Dkt. No. 33-3, p. 111. Greco stated that she learned that this was an employee's boyfriend and that he transported her to and from work. Dkt. No. 33-6, p. 26. Greco testified that she told the employee that "she would have to meet him farther down the street so he was farther away from the center." Dkt. No. 33-6, p. 26.

Plaintiff testified that after receiving the performance appraisal, she contacted human resources about her rating and met with Brodzinski. Dkt. No. 33-3, p. 108. Plaintiff stated that they "discussed the evaluation" and he told her "that he didn't know what my problem was, that he saw many of her evaluations and this was a good one." Dkt. No. 33-3, p. 109.

### D.  Meetings with Tassey and Greco

Sometime after February 2, 2010, plaintiff began meeting with Karen Tassey, Chief Operating Officer for Albany Memorial and Samaritan Hospitals. Dkt. Nos. 33-4, p. 16; 33-10, p. 5. The timeline is not apparent from the record, but plaintiff stated that she met with Tassey three times and that Greco was part of one of those meetings. Dkt. No. 33-4, p. 18. Tassey testified that when they met in February 2010, plaintiff told her that she believed the Children's Center "should have closed" during the December 2008 ice storm and that she had received an "average" performance appraisal. Dkt. No. 33-10, p. 21. Tassey testified that although she did not use the word "retaliation," plaintiff communicated her belief that she had received the corrective actions because of various issues she had raised, including the length of a staff member's fingernails and another staff member's qualifications. Dkt. No. 33-10, pp. 83, 87-88.

Tassey described her meeting with plaintiff and Greco together as a "mediation" session to discuss "expectations." Dkt. No. 33-10, p. 82. Plaintiff testified that during this meeting, she told Tassey that Greco was "barely speaking" to her and deliberately ignoring her. Dkt. No. 33-4, pp. 18-19. Plaintiff testified that she also told Tassey that during a staff meeting, Greco had announced: "If you're mad at Ellen, you should find another way to deal with it, like throw paint at her or something." Dkt. No. 33-4, p. 19. According to plaintiff, Tassey described Greco's behavior as "unacceptable." Dkt. No. 33-4, p. 19.

In September 2010, plaintiff and Greco met "to try to improve [their] relationship." Dkt. No. 33-3, p. 116. Plaintiff testified that when she asked Greco why she had "so much animosity" toward her, Greco responded that "[i]t doesn't feel good to have employees going over your head." Dkt. No. 33-3, p. 116-17. Plaintiff stated that she promised Greco that she would "not go over her head anymore" and that their relationship improved for "a few months." Dkt. No. 33-3, p. 117.

### E. Support of Co-worker's Discrimination Complaint

In or about November 2010, Rebecca Davies, a Children's Center teacher filed a complaint with the Division of Human Rights alleging pregnancy discrimination. Dkt. No. 33-8, pp. 78-79. On November 15, 2010, plaintiff, who was considering whether to write a letter in support of Davies, wrote the following email to Tassey:

> You may remember that you were a sounding board for me and a mediator between Deidre Greco and myself. I would like to preface this by saying that since that time, she is treating me fairly, and with respect. I DO NOT under any circumstances want to revisit the treatment I received last year. Here's my quandary . . .
>
> I'm not sure if you are aware, but a staff member at the Child Care Center has started legal proceedings (I know this because she told me herself) against Ms. Greco and NE Health. It is my understanding [that she contends that she was not] placed in an equal position when she returned from maternity leave. They would like any willing staff to write letters stating what they know about the situation. I would like to do what is right. On one hand I would like the truth to be told, on the other, I fear repercussions for doing so.
>
> I feel that over the past 2 years I have informed our Human Resource Department of unfair treatment of certain staff (not just myself), non-compliance of NE Health policies, untruthfulness, major breaches of confidentiality, and a retaliatory management style of Ms. Greco all that I though[t] could harm NE Health one day. I was not once taken seriously. They "investigate" things by asking Ms. Greco her side, when she denies, Mr. Brodzinski will say "she's the Manager so we have to believe her." In my opinion, not much of an investigation.
> . . . .
>
> I have great respect and admiration for you Ms. Tassey and am asking your opinion. Should my loyalty be with NE Health, or be on the side of right? As an employee, what could happen to me should I put in writing what I know? Any thoughts would be appreciated.

I would respectfully ask that this correspondence with you be kept completely confidential, as I fear a repeat of the past. If you would like to reach me, please [email me or call me at home].

Dkt. No. 32-15, p. 25.

Plaintiff testified that she and Tassey did not discuss this email. Dkt. No. 33-4, p. 86.

Tassey, however, testified that she responded to plaintiff in a telephone call:

Ellen . . . had let me know that she was thinking about . . . a worker that she was going to write a letter for, and she said kind of, "Is that okay to do? I don't want to get in trouble for doing it." And I said, "You can't get in trouble for doing it. You got to do what's right for you, but you can't get in trouble for doing it, but it's completely up to you."

Dkt. No. 33-10, pp. 64-65. Tassey stated that she did not share plaintiff's email with anyone at Northeast Health. Dkt. No. 33-10, p. 66.

On or about November 22, 2010, plaintiff sent a letter in support of Davies. Dkt. No. 33-4, p. 87; *see* Dkt. No. 32-15, p. 3 (letter in support of Davies). In or about February 2011, plaintiff "was contacted by the . . . Division of Human Rights and was interviewed by telephone with respect to Davies' complaint." Dkt. No. 1, p. 4.

Plaintiff testified that she believed Greco knew of her participation in Davies's case because Greco "walked in one day when Ms. Davies and I were discussing it." Dkt. No. 33-4, p. 92. Plaintiff stated that she could not "recall the specifics" of what they were discussing, "just my supporting her." Dkt. No. 33-4, p. 93. Plaintiff testified that she "did not stop speaking immediately" when she saw Greco but "completed [her] thought" and "continued speaking, even though she saw [Greco] standing there." Dkt. No. 33-4, p. 93. Plaintiff stated that Greco was there only "briefly" and did not ask what they were discussing. Dkt. No. 33-4, p. 93. Greco testified that she did not learn that plaintiff had participated in Davies's case until after plaintiff

filed her own case. Dkt. No. 33-6, pp. 81-82. Plaintiff also testified that she told at least two other staff members of her participation in Davies's case. Dkt. No. 33-4, pp. 93-94.

Plaintiff testified that in March 2011, Brodzinski "came to the center to interview staff" about whether they believed Davies's post-maternity leave position "was equal to that of being a teacher." Dkt. No. 33-4, p. 94.[11] Plaintiff stated that Brodzinski "chose" to interview her and that she told him that Davies's current position and past position were "not the same" and that she could "prove it." Dkt. No. 33-4, p. 94. Plaintiff explained to Brodzinski that the positions were different because Davies's present position did not require a high school diploma or GED, while her previous position as a teacher did. Dkt. No. 33-4, p. 96. Plaintiff testified that she did not tell Brodzinski that she thought the Children's Center's treatment of Davies was discriminatory, Dkt. No. 33-4, p. 96, or that she had written a letter for Davies. Dkt. No. 33-4, p. 95.

Brodzinski testified that while investigating Davies's allegations, he met with twelve to fifteen members of the child care staff, including plaintiff.[12] Dkt. No. 33-8, pp. 79-80. Brodzinski testified that plaintiff told him that she felt there was a difference between the positions Davies occupied before and after maternity leave and that the position she returned to was "more of a demotion position." Dkt. No. 33-8, p. 80. Brodzinski testified that he did not learn that plaintiff had contacted the Division of Human Rights in connection with Davies's case until plaintiff "filed her own complaint." Dkt. No. 33-8, p. 81.[13]

---

[11]McCandless testified that she asked Brodzinski to investigate and "to make sure he interviewed all the staff to see the perception of the position that [Davies] was brought back to, if their perception was the same or different, because what you have on paper about a job isn't necessarily how the job carries out in real life." Dkt. No. 33-9, pp. 102-103.

[12]The record does not identify the other employees Brodzinski interviewed.

[13]McCandless stated that she knew Brodzinski interviewed plaintiff but that he did not tell her what plaintiff's thoughts were about Davies's position. Dkt. No. 33-9, p. 103. McCandless testified that she did not learn that plaintiff had participated in Davies's case until plaintiff's Division of Human Rights hearing. Dkt. No. 33-9, p. 105.

McCandless testified that, eventually, Davies "was brought back [to her original position] and the claim was dismissed." Dkt. No. 33-9, p. 103. Brodzinski stated that on or about May 17, 2011, the date of issuance, he received a decision from the Division of Human Rights concerning Davies's complaint. Dkt. No. 33-8, p. 84.

## F. Termination

Plaintiff testified that at some point in mid-May 2011, she heard a teacher call a toddler a "chunky monkey." Dkt. No. 33-4, p. 22. Uncertain whether the term "was something bad," plaintiff asked a co-teacher "her opinion on the chunky monkey name." Dkt. No. 33-4, p. 24. According to plaintiff, the co-teacher responded that it was not "okay with her." Dkt. No. 33-4, p. 23. Plaintiff stated that eventually, the teacher who had used the name learned that plaintiff had questioned her use of it. Dkt. No. 33-4, p. 23.

Plaintiff testified that on May 18, 2011, she and her co-teacher, Mary Sheehy were in their classroom, with children, and were discussing the events that led to plaintiff's identification as the teacher who raised the issue concerning the "chunky monkey" name. Dkt. No. 33-4, p. 23. Plaintiff testified that Sheehy told her that she was responsible for plaintiff's identification. Dkt. No. 33-4, p. 23. Plaintiff stated that she asked Sheehy why she would "do that" because it was a "non-issue," there "was no problem," it was not her "business" and she "shouldn't have gotten involved." Dkt. No. 33-4, p. 24. Plaintiff stated that their "exchange went on for a few minutes," and that they raised their voices. Dkt. No. 33-4, pp. 24-25. Plaintiff explained that, in general, they both were "very loud, very animated, especially in the classroom," and that raising their voices "was nothing new." Dkt. No. 33-4, p. 25.

Later that day, Greco asked plaintiff and Sheehy to provide written statements about their disagreement because a parent had heard their exchange and complained. Dkt. No. 33-4, p. 26.

Plaintiff testified that Greco commented that the parent was "a pain in the neck." Dkt. No. 33-4, p. 26. In her statement, plaintiff wrote:

> On Wednesday morning, 5/18, Mary and I were having a discussion about something one staff person had said to another that involved me. She told me that she had advised that person to say something. I questioned her about "why" she had done that because it never involved her. She said "well, if it were her, she would not want people thinking she had said something that she didn't say". I told her that this was completely a "non-issue", until HER involvement had turned it into one. I repeatedly told her that it was never her business and she should have never gotten involved. Mary and I are friends in addition to being co-workers, and I was hurt that she would not admit that she was wrong in getting involved; I did raise my voice and later apologized. At no time were either of us "out of control". Both Mary and I have large, booming voices and the children did not seem to notice the disagreement.

Dkt. No. 32-13, p. 4. Plaintiff testified that after Greco read her statement, "she said, 'That's pretty much exactly what [Sheehy] said happened.'" Dkt. No. 33-4, p. 26.

The parent who complained sent Greco the following written statement:

> When I was going into [a classroom] this morning I heard people shouting at each other and babies crying so loudly, I wasn't certain to where the noise was coming from at first so I went into [my child's] classroom to put his stuff away and the shouting continued. I went into the hallway and noticed that it was coming from the infant room across the hall. I peeked in and two teachers were screaming at each other. I heard one of the staff shout "You should have never said anything you should have never gotten involved." They must have been screaming at each other for more than [five minutes]. This is when I went to the office to find you or Heather.

Dkt. No. 32-13, p. 4. Greco stated that at the time of the alleged incident, she was giving a tour and was in the classroom next to plaintiff's classroom but did not hear any commotion or screaming in plaintiff's classroom. Dkt. No. 33-6, pp. 88, 235-36. Greco testified that after conducting her investigation, she recommended that plaintiff and Sheehy be terminated. Dkt. No. 33-6, p. 117. At her deposition, she explained:

> Both are very experienced teachers with a strong background in education. My concern was that if they were so out of control and angry that they were screaming at each other for a period of time in a room full of babies, that in my

experience if you are very angry and upset and you pick a child up, you do not necessarily do it in the most gentle and caring manner.

So my concern was that there was a potential harm for the children.

Dkt. No. 33-6, p. 117.

Brodzinski testified that prior to "determining what to do from a corrective action standpoint," Dkt. No. 33-8, p. 86, he investigated the incident. Dkt. No. 33-8, p. 84. Brodzinski stated that Greco "got statements from staff" and that he "met and spoke with . . . the parent who overheard the argument." Dkt. No. 33-8, pp. 85-86. Brodzinski testified that after looking "at everything" he recommended terminating both plaintiff's and Sheehy's employment. Dkt. No. 33-8, p. 96. [14]

On Friday, May 20, 2011, Greco informed plaintiff and Sheehy that their employment had been terminated. Dkt. No. 33-4, pp. 21, 30. Plaintiff stated that she and Sheehy immediately appealed their terminations to McCandless, who told them that they "would be . . . on unpaid suspension while she . . . investigated." Dkt. No. 33-4, pp. 31-32, 34.

McCandless testified that as part of her investigation, she spoke to plaintiff, Sheehy, the parent who made the complaint, Greco, and Brodzinski. Dkt. No. 33-9, p. 16. McCandless testified that she also received a number of letters from parents on plaintiff's behalf, though she could not recall whether she received them "before or after the decision" to uphold the termination of plaintiff's employment. Dkt. No. 33-9, p. 40. McCandless stated that, either way, the letters were not "relevant" to her decision because plaintiff was "a very good care provider," and her "performance was never questioned." Dkt. No. 33-9, p. 46.

_____

[14]Plaintiff testified that during one of her "final two . . . face-to-face conversations" with Brodzinski before her termination she told him that she "was being discriminated against" and that he responded "Why, because you're a woman?" and "chuckled." Dkt. No. 33-4, p. 83. Plaintiff stated that she responded: "No, for going over [Greco's] head and reporting violations and indiscretions." Dkt. No. 33-4, pp. 83-84. As described herein, plaintiff made a variety of complaints about the Children's Center which were unrelated to Title VII. Neither party claims this conversation is material to the present case.

In an email to McCandless dated Monday, May 23, 2011, plaintiff wrote:

> I wanted to make one other point before you ma[k]e your final decision, If the parent and teacher who overheard what happened in the classroom that morning had been so concerned about the children, wouldn't they have immediately intervened?
>
> It seems to me that anyone who thought children's well-being was threatened would not stand outside the room, listen for the duration, and **then** go to the director to report it. Opening up the door and saying "Is everything ok in here?" would be a much more normal reaction. I think this is a major piece of evidence that proves this was not the "war" it's been made out to be. There was no "yelling back and forth," and at no time were any children crying.

Dkt. No. 32-13, p. 7.

In an email to Tassey dated Tuesday, May 24, 2011, plaintiff wrote:

> You may recall the "mediation" meeting you had with myself and Deirdre Greco of the Child Care Center. I showed you evidence of corrective actions that were made in retaliation and without following proper procedure. I said then, that Greco was trying her best to "get rid of me," and she has done just that. You could see the handwriting on the wall, and so you initiated the [three-]way meeting. How sad it is that all the times I went to our Human Resource Department to try and get some support, all I ever got from Joe Brodzinski was, "Well, it doesn't really matter what you say, because [Greco] says the opposite and because she is the manager we **have** to believe her." In my opinion, that's not much investigation. It's been frustrating watching her get away with whatever she wanted to do, and have HR wrapped around her little finger. So far, McCandless's response is . . . "well, sometimes life isn't fair, we're not always treated fairly." Excuse me, but isn't it her **job** to make sure employees are treated fairly?
>
> I plan to fight this termination to the best of my ability. I have the support of all the parents of the children I care for. I have knowledge of REAL staff violations that are never addressed. If nothing else, I'll leave having the satisfaction of knowing that I excelled at my job and made a difference in many lives, it's too bad everyone else involved cannot say the same.

Dkt. No. 32-13, p. 8. (emphasis in original).

In an email to McCandless dated May 26, 2011, plaintiff wrote: "Like any manager, [Greco] sets the tone for her staff. When she's negative, vindictive, makes snide comments about others, breaches confidentiality, and I could go on and on . . . her staff thinks it's ok to do the same." Dkt. No. 32-13, p. 11. Plaintiff sent McCandless a second email that day:

I don't know how many times over the past couple of years Joe Brodzinski tried to coerce me into saying that I don't like my job. I always set him straight, telling him that I LOVE my job, children, parents and coworker [sic]. What I didn't love was the way Deirdre treated me. I felt like [Brodzinski] was trying to take advantage of me when I would go to him for guidance. That is why he knew I would not be comfortable speaking to him after his "termination" call, and I agreed to speak to you instead.

Dkt. No. 32-13, p. 12.

McCandless testified she made her final decision to deny plaintiff's appeal during the week of May 23, 2011. Dkt. No. 33-9, p. 38. McCandless reversed Sheehy's termination, however, because Sheehy "had more seniority and no corrective action" history. Dkt. No. 33-9, p. 97.[15]

Plaintiff next appealed to Tassey. Dkt. No. 33-10, pp. 13-14. In an email to Tassey, Norman Dascher, the Chief Executive Officer of Albany Memorial Hospital and Samaritan Hospital, and James Reed, the Chief Executive Officer of Northeast Health, dated May 30, 2011, plaintiff wrote:

In advance of a scheduled meeting with Ms. Tassey this coming Friday concerning my recent employment termination, I am attaching a short letter outlining why I feel I was unfairly let go, my reasons for appeal and why I dearly want to be reinstated. I hope you will read this knowing that I am a dedicated 8 year employee and have always strived for excellence.

Dkt. No. 32-13, p. 14. In the attached letter, plaintiff contended that her two corrective action notices were "suspect" and that she never received a "Final Written Warning" as outlined in

---

[15]McCandless admitted that the word "seniority" does not appear in Northeast Health's corrective action policy. Dkt. No. 33-9, p. 99.

Northeast Health's "Corrective Action Policy."[16] Dkt. No. 33-12, p. 15. Plaintiff acknowledged that the final written warning step could be bypassed if the incident leading to termination was a "serious infraction," but argued that the alleged incident "was neither serious nor egregious." Dkt. No. 33-12, p. 15.

As part of her investigation, Tassey reviewed the statement of the parent who had complained about the disagreement and interviewed her in person. Dkt. No. 33-10, p. 35. Tassey also spoke with Sheehy and the staff member to whom the parent initially complained. Dkt. No. 33-10, p. 36. In a letter dated June 17, 2011, Tassey informed plaintiff that she had "re-interviewed the individuals involved in the May 18, 2011 incident" and concluded:

> Based on your own testimony and that of the witnesses, I believe that a loud argument occurred between you and your coworker, Mary Sheehy. I feel the information provided by the parent who overheard this argument is factual. Not only has this parent been a long term and trusted staff member, but, she is also someone whose training and work experience would not result in an overreaction. The fact that another coworker also witnessed the incident, backs up the statements by the first witness.
>
> Due to your previous corrective actions and your admitted lack of respect and disregard for the Executive Director's oversight of the daycare center, we will not reverse our decision to terminate your employment. I understand you may not agree with this decision, however, this decision is final and concludes the appeal process.

Dkt. No. 32-13, p. 16.[17]

---

[16]Northeast Health's Corrective Action Policy, which became effective on August 2, 2010, states: "This policy should be applied uniformly and in a fair, respectful and equitable manner, but also take into account individual circumstances." Dkt. No. 32-9, p. 1. Regarding "Discharge," it states, in pertinent part:

> For repeated misconduct or poor work performance that persists after a first, second, or final written notice has been issued or for very serious first-time infractions, such as, but not limited to, poor patient care, misappropriation of property, engaging in fraud or abuse, or unsafe conduct, the employee will be discharged. Managers will call Human Resources for problem-solving consultation and documentation instructions.

Dkt. No. 32-9, p. 3.

[17]Tassey testified that if she had known that Greco was in the classroom next to plaintiff's classroom during the incident and did not hear anything she did not know what she "would have done" with respect to plaintiff's appeal and that "maybe" it would have changed her mind. Dkt. No. 33-10, p. 42.

On August 18, 2011, plaintiff filed a verified complaint with the New York State Division of Human Rights and the United States Equal Employment Opportunity Commission ("EEOC") alleging that Northeast Health "terminated her employment as an act of retaliation because of her participation with the prior Division case." Dkt. No. 32-4, p. 1. On February 8, 2012, following an investigation, the Division of Human Rights dismissed plaintiff's complaint. Dkt. No. 32-4, pp. 1-2. On July 12, 2012, the EEOC adopted the findings of the Division of Human Rights and issued a right to sue notice. Dkt. No. 32-4, p. 3. On October 10, 2012, plaintiff commenced this action. Dkt. No. 1.

## III.  DISCUSSION

### A.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth*., 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where

the nonmoving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim") (internal quotation marks omitted).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Further, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

**B. Title VII and NYSHRL**

Northeast Health contends there is no evidence from which a reasonable fact-finder could conclude that it terminated plaintiff's employment in retaliation for her participation in Davies's pregnancy discrimination case. Dkt. No. 32-23, p. 11. In order to survive a motion for summary judgment, a Title VII plaintiff must satisfy the three-step burden-shifting test set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also*

*Abrams v. Dep't of Public Safety*, 764 F.3d 244, 254 (2d Cir. 2014) ("Retaliation under Title VII is also measured under the three-step *McDonnell Douglas* analysis.") (citing *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)). The same analysis applies to retaliation claims under the NYSHRL. *Hicks*, 593 F.3d at 164. The Court therefore will analyze the claims together. "Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Abrams v. Dep't of Public Safety*, 764 F.3d 244, 251 (2d Cir. 2014) (citing *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 446 (2d Cir.1999)).

### 1. Prima Facie Case

To establish a prima facie case of retaliation, plaintiff must show that: (1) she participated in a protected activity; (2) the employer was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal connection between her engagement in the protected activity and the adverse employment action. *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). Plaintiff's burden of proof is *de minimis* at this stage. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). It is undisputed that plaintiff's termination constitutes an adverse employment action; the parties dispute whether plaintiff has established the other three elements of a prima facie case.

### a. Protected Activity

"Title VII's anti-retaliation provision contains both an opposition clause and a participation clause." *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 48 (2d Cir. 2012). The

opposition clause makes it "unlawful for an employer to retaliate against an individual because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). The participation clause, on the other hand, makes it "unlawful for an employer to retaliate against an individual . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

Viewing the facts in the light most favorable to plaintiff, there is evidence showing three instances of protected activity: (1) Plaintiff's November 2010 email to Tassey; (2) her involvement in the Division of Human Rights' investigation of Davies's case (via letter and phone interview); and (3) her March 2011 interview with Brodzinski. Defendants concede that plaintiff's November 2010 contact with the Division of Human Rights is protected activity but challenge the other two instances.

Defendants argue that plaintiff's November 2010 email to Tassey, Dkt. No. 32-15, p. 25, about whether she could be retaliated against for writing a letter on behalf of a co-worker, was not protected activity because plaintiff did not claim that she believed the co-worker was discriminated against because of her sex. Dkt. No. 32-23, p. 16. However, an employee's complaint may qualify as protected activity so long as she had "a good faith, reasonable belief that [s]he was opposing an employment practice made unlawful by Title VII." *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001). In her email to Tassey, plaintiff wrote that she "would like the truth to be told," but that she was concerned there would be reprisals if she chose to send a letter in support of a co-worker who claimed she was not "placed in an equal position when she returned from maternity leave." Dkt. No. 32-15, p. 25. Thus, the Court concludes, at the prima facie stage, that plaintiff's communication to Tassey that she wished to

support a co-worker who had filed a legal action complaining of pregnancy-related discrimination or retaliation is sufficient to show protected activity. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 175 (2d Cir. 2005) (concluding that "Congress intended the anti-retaliation clause to protect [the plaintiff,] a volunteer witness poised to testify in support of a co-worker's discrimination claims.").

Northeast Health advances a similar argument with respect to plaintiff's March 2011 interview with Brodzinski: that because plaintiff did not tell him that she believed Davies's demotion was due to pregnancy discrimination, it does not qualify as protected activity. Even assuming plaintiff's interview did not constitute "opposition" to discrimination, because it was part of Northeast Health's internal investigation following Davies's filing of a pregnancy discrimination complaint with the Division of Human Rights, the activity would appear to fall within the participation clause of Title VII's anti-retaliation provision. The Second Circuit has not ruled on whether an employee's participation in an internal investigation conducted in response to a formal charge filed with the EEOC falls within the scope of the participation clause. *Townsend*, 679 F.3d at 48 n.6. The clause, however, is broadly worded to bar discrimination against an employee who has "participated in any manner in" an EEOC investigation. 42 U.S.C. § 2000e-3(a). The Sixth and the Eleventh Circuits have held that an employee's participation in an employer's internal investigation in conjunction with or in response to an EEOC charge is protected under Title VII. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 543 (6th Cir. 2003); *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999). Thus, plaintiff has sustained her burden of producing evidence that she engaged in protected activity.

To the extent plaintiff argues that her complaints to Greco and her other superiors concerning, among other things, whether an employee had proper credentials, the length of an employee's fingernails, an employee who fell asleep on duty and the decision to open the Children's Center during a state of emergency also constitute protected activity, her argument lacks merit.[18] None of these complaints concern unlawful discrimination, and thus, no rational fact-finder could conclude that plaintiff held a "good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII." *McMenemy*, 241 F.3d at 285; *see also Drumm v. SUNY Geneseo Coll.*, 486 F. App'x 912, 914 (2d Cir. 2012) (finding that "plaintiff's allegations that her supervisor 'berated' her and made other harsh comments—for example, that she was a 'disappointment' to him—amount only to general allegations of mistreatment," and did not "support an inference that plaintiff had a reasonable good faith belief that" she challenged conduct that constituted gender discrimination).

### b. Knowledge of Protected Activity

The Second Circuit has held, "for purposes of a prima facie case, a plaintiff may rely on 'general corporate knowledge' of her protected activity to establish the knowledge prong of the prima facie case.'" *Kwan v. Andalex Group LLC*, 737 F.3d 834, 844 (2d Cir. 2013). As an initial matter, there is no evidence that Tassey, or anyone in a supervisory position,[19] knew that plaintiff had submitted a letter of support to, or that she was interviewed by, the Division of Human Rights in connection with Davies's case until after plaintiff filed a charge of retaliatory discharge. The only evidence plaintiff offered on this score was her testimony that, at some point in November 2010, Greco walked in on a conversation she was having with Davies. Dkt. No. 33-

---

[18]In her response to Northeast Health's motion for summary judgment, plaintiff does not oppose the argument that these are not protected activities within the meaning of Title VII. Dkt. No. 33, pp.18-19.

[19]Plaintiff testified that at least two co-workers knew she was supporting Davies. Dkt. No. 33-4, pp. 93-94.

4, pp. 92-93. Plaintiff could not recall, however, what they were talking about or whether it was before or after she had submitted the letter. Thus, plaintiff fails to adduce evidence that Northeast Health knew of her involvement in the Division of Human Rights' investigation of Davies's complaint.

It is undisputed, however, that Tassey, the Chief Operating Officer for Albany Memorial Samaritan Hospitals, and one of the individuals to whom plaintiff subsequently appealed her termination, Dkt. No. 33-10, p. 29, knew that plaintiff wanted to write a letter in support of a co-worker's discrimination claim. The Court assumes for purposes of this motion that this is sufficient to impute to Northeast Health general corporate knowledge of plaintiff's protected activity. *See Kwan*, 737 F.3d at 844 (holding that discrimination complaint to an officer of the defendant corporation "was sufficient to impute" to the corporation "general corporate knowledge of the plaintiff's protected activity."). In any event, plaintiff's participation in its internal investigation of Davies's complaint satisfies the knowledge prong. When Brodzinski interviewed plaintiff during his investigation of Davies's pregnancy discrimination claim, she told him she believed that Davies had been demoted. Dkt. No. 33-8, p. 80. Brodzinski was Northeast Health's Director of Human Resources and the same individual who later recommended plaintiff's termination. Thus, plaintiff has adduced evidence to show, at the prima facie stage, Northeast Health's knowledge of her protected activity.

### c. Causal Connection

Plaintiff argues that she has shown a causal connection between her protected activity and her termination through evidence that (1) Northeast Health disciplined her more harshly than other employees, who did not engage in protected activity, but engaged in similar conduct; and (2) temporal proximity. "'Proof of causation can be shown . . . indirectly . . . through  . . .

circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct'" or "'by showing that the protected activity was followed closely by'" the adverse employment action. *Hicks*, 593 F.3d at 170 (quoting *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (internal alternation omitted)).

Plaintiff argues that Northeast Health's retaliatory motive can be inferred from its failure to discipline two similarly situated employees who, like plaintiff, were involved in a verbal altercation but who had not engaged in protected activity. An employee is similarly situated to co-employees if they were (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Id.* In other words, the comparator must be similarly situated to the plaintiff "in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997).

It is undisputed that Children's Center assistant teachers Meagan Green and Carlos Torres had an argument on the playground in the presence of children, but were not punished. Dkt. No. 33-5, p. 61. Greco testified that after a staff person notified her of the incident, she spoke with Green and Torres, who admitted that they had argued on the playground. Dkt. No. 33-5, pp. 62, 53. Greco told them that such arguments "couldn't happen" and if they did, "they needed to do them outside of the playground." Dkt. No. 33-5, p. 62. Greco did not discipline either employee for this incident. Dkt. No. 33-5, p. 63. She explained: "I know that they were young, inexperienced staff members who I was trying to help to be better teachers, and so I did

not expect their judgment to be as good as I would expect Ellen and Mary's judgment to be." Dkt. No. 33-6, pp. 123-24.

It is also undisputed that Green and Torres were subject to the same disciplinary standards as plaintiff. Indeed, all three employees were supervised by Greco. Although the conduct was similar - - all three were involved in arguments while on duty and in the presence of children - - plaintiff's incident appears to be more serious because it occurred in an infant room and led to a parental complaint. In any event, Green and Torres are not similarly situated because there is no evidence regarding when the verbal altercation occurred, and no evidence that, at the time of the verbal altercation, Green or Torres had disciplinary records similar to plaintiff's.[20] *See, e.g., Paladino v. DHL Express (USA), Inc.*, No. 07-CV-1579, 2010 WL 1257786, at *11, 2010 U.S. Dist. LEXIS, at *34 (E.D.N.Y. Mar. 26, 2010) ("[I]t cannot be said that these employees, who were not on a last chance agreement, were similarly situated to Plaintiff."); *McKinney v. Bennett*, No. 06 Civ. 13486, 2009 WL 2981922, at *7, 2009 U.S. Dist. LEXIS, at *20 (S.D.N.Y. Sept.16, 2009) (plaintiff was not similarly situated where the comparators did not have a comparable disciplinary history); *Jeunes v. Potter*, CIV. NO. 3:08CV1218, 2009 WL 2883060, at *9, 2009 U.S. Dist. LEXIS, at *27 (D. Conn. Sept. 3, 2009) (plaintiff "had several disciplinary actions against him and termination of employment was the next step in his progressive discipline"); *Guerrero v. Conn. Dep't. of Children & Families*, 315 F. Supp. 2d 202, 210 (D. Conn. 2004) (holding that plaintiff "is dissimilar from the comparator based on the fact that his disciplinary record is far worse than that of the comparator"); *Rommage v. MTA Long*

---

[20]In her memorandum of law, plaintiff asserts that Green had received a final written warning for leaving a child on the playground prior to engaging in a verbal altercation with Torres. Dkt. No. 33, p. 13. Plaintiff, who does not claim to have personal knowledge of either incident, does not cite any evidence in the record that would support this claim. Greco testified that she could not recall whether Green had received the final written warning before or after the verbal altercation. Dkt. No. 33-5, p. 66. Greco testified that Torres engaged in misconduct on other occasions: sleeping on duty and using his cellphone while on duty, and admitted he was not formally disciplined. Dkt. No. 33-5, pp. 53-56. Again, however, there is no evidence regarding when this misconduct occurred.

*Island R.R.*, No. 08-cv-836, 2010 WL 4038754, at \*9, 2010 U.S. Dist. LEXIS 104882, at \*27 (E.D.N.Y. Sept. 30, 2010) (finding "isolated instances where an employee received a different discipline than [the plaintiff] did for a similar violation were . . . insufficient to show that plaintiff's termination was on the basis of discrimination, especially considering that plaintiff's disciplinary history is far worse than that of the comparators."). Thus, there is no basis on which a jury could conclude that plaintiff, Green and Torres were similarly situated and that the difference in Northeast Health's response to their conduct is attributable to unlawful retaliation.[21]

Plaintiff argues that she has satisfied the causal connection prong through the temporal proximity between her protected activity and her termination. Plaintiff was terminated in May 2011, two months after her March 2011 interview with Brodzinski. For purposes of establishing a prima facie case of retaliation, two months is sufficient to show a "causal connection between the protected activity and the adverse employment action." *Jute*, 420 F.3d at 173 (citation and internal quotation marks omitted); *see also Gorzynski*, 596 F.3d at 110 ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship.") (citations omitted).

However, "[a]n intervening event between the protected activity and the adverse employment action may defeat the inference of causation where temporal proximity might otherwise suffice to raise the inference." *Joseph v. Marco Polo Network, Inc.*, No. 09 Civ. 1597, 2010 WL 4513298, at \*18, 2010 U.S. Dist. LEXIS 119713, at \*56 (S.D.N.Y. 2010); *see Gubitosi v. Kapica*, 154 F.3d 30, 33 (2d Cir. 1998) (concluding that the plaintiff failed to carry her burden

---

[21]Plaintiff also cites the following incidents in support of her disparate treatment argument: Greco told staff to "throw paint" on plaintiff when they were mad at her but did not receive a corrective action, Dkt. No. 33-4, p. 19 and an employee left a child on the playground but did not receive a corrective action. Dkt. No. 33-5, pp. 74-77. Even if the conduct of these employees could be considered comparable to plaintiff's, there is no evidence that plaintiff, Greco and the staff member who allegedly left a child on the playground had similar disciplinary histories.

of showing that the defendant engaged in retaliatory termination, even where there was a "short period of time between" her First Amendment activity and termination, given "the significant intervening events between these two dates," namely, the plaintiff's disobedience of an order from her superior and false written statement).

Here, it is undisputed that on May 18, 2011, plaintiff engaged in a disagreement with a co-worker inside the classroom with infants present. It is also undisputed that the disagreement drew the attention of a parent and prompted her to complain to plaintiff's supervisors. Thus, while the relatively short period of time between the March 2011 interview with Brodzinski and the May 20, 2011 termination of plaintiff's employment might suffice to raise the inference of temporal proximity, the intervening May 18 disturbance in the infant classroom breaks that causal connection. *See Joseph*, 2010 WL 4513298, at *18, 2010 U.S. Dist. LEXIS 119713, at *56 (finding that the plaintiffs failed to establish a prima face case of retaliation, explaining that although "the ten-or-so day interval between" the protected activity and the termination of their employment was "short enough to create an inference of causation, the intervening security breach breaks that causal connection.") (internal citation omitted); *Kiel v. Select Artificials, Inc*., 169 F.3d 1131, 1136 (8th Cir. 1999) (determining that insubordination was "intervening unprotected conduct" that "eroded any causal connection that was suggested by the temporal proximity of [the plaintiff's] protected conduct and . . . termination.").

Moreover, an inference of retaliation does not arise from temporal proximity here because plaintiff's termination followed a history of corrective action notices and difficulty working with others that began long before any protected activity. "An inference of retaliation does not arise" "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity." *Slattery v.*

*Swiss Reinsurance Am. Corp*., 248 F.3d 87, 95 (2d Cir. 2001) (holding that causation could not be inferred from temporal proximity when "the adverse employment actions were both part, and the ultimate product, of 'an extensive period of progressive discipline' which began when Swiss Re diminished Slattery's job responsibilities a full *five months prior* to his filing of the EEOC charges.").

In 2008, Greco noted in plaintiff's performance appraisal that there were staff members who were "concern[ed]" about working with plaintiff. Dkt. No. 32-11, p. 25. That same year, plaintiff received a corrective action notice for "misconduct" toward her supervisor. Dkt. No. 32-12, p. 4. In January 2010, ten months before the protected activity, Greco noted plaintiff's "problematic" relationships with other staff members, Dkt. No. 32-11, p. 30, and issued a second corrective action notice for "inappropriate attitude and interaction [with] co-workers." Dkt. No. 32-12, p. 7. On this record, plaintiff has failed to adduce evidence showing a causal connection between her protected activity and her termination.

### 2. Legitimate Non-Retaliatory Reason

Assuming *arguendo* that plaintiff established a prima facie case of retaliation and that a presumption of retaliation arises, the burden next shifts to the defendant to demonstrate some legitimate, non-retaliatory reason for the adverse decision or action. *McDonnell Douglas Corp*., 411 U.S. at 802; *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011). Here, defendants have adduced evidence that plaintiff's "employment was terminated due to her repeated incidents of inappropriate behavior toward her supervisor and coworkers in front of others, including infants [who] were under her care." Dkt. No. 32-23, p. 23. These are legitimate non-retaliatory reasons for her termination. Thus, the burden returns to plaintiff.

### 3. Pretext and "But-For" Causation

Here, for many of the same reasons plaintiff failed to satisfy her burden of establishing the causal connection prong of her prima facie case of retaliation, she fails to show that Northeast Health's reason for terminating her was a pretext for retaliation, and that she would not have been terminated but-for her protected activity. Under the *McDonnell Douglas* framework, if the defendant provides a non-retaliatory reason for the plaintiff's termination, that reason overcomes the presumption of retaliation created by the plaintiff's prima facie case. *Kwan*, 737 F.3d at 845. The defendant is then entitled to summary judgment unless the plaintiff comes forward with evidence showing that the "non-retaliatory reason is a mere pretext for retaliation," *id.*, and that the plaintiff's "protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, __ U.S. __, 133 S. Ct. 2517, 2534 (2013); *see also Sass v. MTA Bus Co.*, 6 F. Supp. 3d 238, 246-47 (E.D.N.Y. 2014) (applying but-for standard to the plaintiff's retaliation claims under Title VII and NYSHRL); *Bowen–Hooks v. City of New York*, 13 F. Supp. 3d 179, 218–22 (E.D.N.Y. 2014) (same). Thus a plaintiff alleging retaliation in violation of Title VII must show that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S.Ct. at 2533.[22]

In *Kwan*, the Second Circuit explained that "'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action

---

[22]The Supreme Court's decision in *Burrage v. United States*, __ U.S. __, 134 S. Ct. 881 (2014) did not, as plaintiff suggests, change the standard for causation in Title VII cases. Dkt. No. 33, p. 21. In *Burrage*, in fact, the Supreme Court cited to *Nassar* in support of its holding that but-for causation is required to prove death or serious bodily injury resulting from the use of a controlled substance under 21 U.S.C. § 841(b)(1)(A) – (C). The language plaintiff cites from a footnote in *Burrage* concerned a prior version of Title VII. *See Burrage*, 134 S. Ct. at 889 n.4; *Nassar*, 133 S. Ct. at 2525-26.

would not have occurred in the absence of a retaliatory motive." 737 F.3d at 846. The court

noted that:

> A plaintiff may prove that retaliation was a but-for cause of an adverse
> employment action by demonstrating weaknesses, implausibilities,
> inconsistencies, or contradictions in the employer's proffered legitimate,
> nonretaliatory reasons for its action. From such discrepancies, a reasonable juror
> could conclude that the explanations were a pretext for a prohibited reason.

*Id*. (citing, *inter alia*, *Byrnie v. Town of Cromwell, Bd. of Educ*., 243 F.3d 93, 105–07 (2d Cir.

2001)). To show pretext and retaliatory motive, a plaintiff "may rely on evidence comprising her

prima facie case, including temporal proximity, together with other evidence such as inconsistent

employer explanations, to defeat summary judgment at that stage." *Id*. (citing *Raniola v. Bratton*,

243 F.3d 610, 625 (2d Cir. 2001)).

Here, the Court finds that plaintiff has not presented evidence from which a reasonable

trier-of-fact could conclude that she would not have been terminated in the absence of a

retaliatory motive.  The rejection of plaintiff's final appeal cited to her "loud argument" in the

infant room as well as her  "previous corrective actions and [her] admitted lack of respect and

disregard for the Executive Director's oversight of the daycare center." Dkt. No. 32-13, p. 16.

Plaintiff has not cited to any basis for a finding that these reasons were pretextual, or that the real

but-for reason for her discharge was intentional retaliation.

As an initial matter, assuming that plaintiff met her burden of establishing a prima facie

case, it was a weak case. Indeed, she could only establish the causal connection prong through

evidence of temporal proximity. While temporal proximity is enough to satisfy a plaintiff's

minimal burden at the prima facie stage, "[t]emporal proximity alone is insufficient to defeat

summary judgment at the pretext stage." *Kwan*, 737 F.3d at 847. Here, temporal proximity alone

is particularly insufficient because, as discussed earlier, any inference of causation was defeated

by the significant intervening event of the May 18 disturbance in the infant room, and by the history of correction action notices and problematic working relationships, which began long before any protected activity.

Further, it is undisputed that plaintiff was involved in a "disagreement" with Sheehy, during which she "raised" her voice in the presence of infants, and that this disagreement prompted a parental complaint. Plaintiff claims that termination was unjustified because the disagreement involved nothing more than raised voices and did not disturb the children in their classroom. Regardless of the intensity of the disagreement, however, the disagreement is a non-retaliatory basis for terminating plaintiff's employment. *See Joseph v. Owens & Minor Dist., Inc.*, 5 F. Supp. 3d 295, 319-20 (E.D.N.Y. 2014) (finding that the plaintiff failed to adduce evidence of pretext because "regardless of who was responsible for the disagreement" based on which the plaintiff was terminated, "the disagreement itself is a non-retaliatory basis for terminating Plaintiff."); *Oliveras v. Wilkins*, No. 06–CV–3578, 2012 WL 3245494, at *14, 2012 U.S. Dist. LEXIS, at *47 (S.D.N.Y. June 26, 2012) (holding that even if employer's conclusion that plaintiff was responsible for an argument was in error, "that error in and of itself would not allow one to infer a gender-based discriminatory motive underlying the decision to terminate plaintiff"), *report & recommendation adopted*, No. 06–CV–3578, 2012 WL 3245493, 2012 U.S. Dist. LEXIS 110938 (S.D.N.Y. Aug. 3, 2012); *Sharpe v. Utica Mut. Ins. Co*., 756 F. Supp. 2d 230, 250 (N.D.N.Y. 2010) ("[T]he fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination.").

Plaintiff also argues that a factfinder could draw an inference of pretext and retaliation from Northeast Health's alleged violation of its corrective action policy when it terminated her employment without first giving her a final written warning. Northeast Health's Corrective Action Policy, however, does not require the issuance of a final written notice prior to discharge; it states that an employee may be discharged for "repeated misconduct . . . that persists after a first, second, or final written notice has been issued." Dkt. No. 32-9, p. 3. Plaintiff does not present any evidence to the contrary. Although plaintiff argues they were unjustified, it is undisputed that she received a two corrective action notices, one for misconduct and one for "inappropriate attitude" prior to the disagreement which led to her termination. Thus, there is no evidence from which a reasonable juror could conclude that plaintiff's discharge for her involvement in the disagreement after receiving two corrective action notices was procedurally inconsistent with Northeast Health's corrective action policy.

Plaintiff further argues that Northeast Health's failure to discipline other employees who also engaged in a verbal altercation in front of children demonstrates that her termination was retaliatory. Dkt. No. 33, p. 26. As discussed, there is no evidence that plaintiff and the staff members who were involved in a verbal altercation, but not disciplined, were similarly situated with respect to disciplinary history. Additionally, unlike the disagreement in which plaintiff was involved, there is no evidence that a parent complained. Nor is there evidence in the record before the Court suggesting when or under what circumstances the altercation occurred.

Moreover, it is undisputed that Sheehy, who did not participate in protected activity, was initially terminated for the same conduct. Although Sheehy's termination was later reversed (based on her seniority and clean disciplinary history), she received a final written warning for her involvement in the disagreement. Thus, on this record, there is no basis on which a fact-

finder could conclude that the reason plaintiff was disciplined more harshly than other employees was unlawful retaliation.

Northeast Health presented ample evidence of legitimate, non-retaliatory reasons for terminating plaintiff's employment. Although the evidence reflects plaintiff's exceptional performance as a teacher and child care provider, it also shows that her employer was concerned about her behavior toward staff members beginning in 2008, two years prior to plaintiff's protected activity. *See* Dkt. No. 32-11, p. 25. As discussed above, plaintiff does not deny that the incidents underlying the corrective action notices or her discharge occurred; she claims only that her behavior was not inappropriate. However, the fact that an employee "disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination." *Grant v. Roche Diagnostics Corp.*, No. 09–CV–1540, 2011 WL 3040913, at *11, 2011 U.S. Dist. LEXIS 79994, at *36 (E.D.N.Y. July 20, 2011) (quoting *Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008)); *see also Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 117–18 (2d Cir. 2010) (plaintiff's disagreement with her employer over whether her behavior was inappropriate was not enough to allow a rational factfinder to find that defendants' proffered reasons for plaintiff's termination were pretextual).

Having thoroughly reviewed the record, the Court finds no material issues of fact from which a reasonable fact-finder could conclude that Northeast Health would not have terminated plaintiff's employment but for unlawful retaliation. Plaintiff's disagreement with Sheehy was investigated three times by three different supervisory officials, all of whom concluded that discharge was warranted. As plaintiff has adduced no evidence that would permit an inference

that retaliation played any role in Northeast's decision to terminate her employment, Northeast Health is entitled to summary judgment as a matter of law.

### C. Breach of Contract

Northeast Health also seeks summary judgment dismissing plaintiff's breach of contract claim. In the seventh cause of action, plaintiff alleges:

> In making reports both internally and to outside governmental agencies, plaintiff relied on the prohibition of retaliation contained in defendants' own employment policies in believing that she was acting in accordance with defendants' wishes for a safe workplace and that she would not lose her job as a result.
> Defendants' violation of the prohibition of retaliation contained in their own employment policies constitutes a breach of contract.

Dkt. No. 1, p. 12 (paragraph numbers omitted). Plaintiff claims that because she "relied on the policies in her employee handbook, and since defendants have failed to enforce their own policies, defendants are not entitled to summary judgment" on her breach of contract claim. Dkt. No. 33, p. 28.

In New York, "[w]here the term of employment is for an indefinite period of time, it is presumed to be a hiring at will that may be freely terminated by either party at any time for any reason or even for no reason." *Lobosco v. New York Tel. Co.*, 96 N.Y.2d 312, 316 (2001). "An employee may rebut the presumption of at-will employment, however, by demonstrating an 'express limitation in the individual contract of employment curtailing an employer's right to terminate at will.'" *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 231 (2d Cir. 2014) (quoting *Baron v. Port Auth. of N.Y. & N.J.*, 271 F.3d 81, 85 (2d Cir. 2001) (internal quotation marks omitted)). The New York Court of Appeals has cautioned, however, that "[r]outinely issued employee manuals, handbooks, and policy statements should not be lightly converted into binding employment agreements." *Lobosco*, 96 N.Y.2d at 317. "This is especially true where the

handbook contains an express disclaimer." *Martin v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 236 (E.D.N.Y. 2010) (citing *Lobosco*, 96 N.Y.2d at 317).

Here, there is no evidence from which a reasonable fact-finder could conclude that the employment relationship between plaintiff and Northeast Health was contractual in any respect. Plaintiff's signed employment application specifies that: "The employment relationship is 'at-will' and may be terminated by either party at any time." Dkt. No. 32-6, p. 2. Further, the Northeast "Staff Handbook" states: "neither the handbook's policies nor any representations made by a management representative, at the time of hire or subsequently, are to be interpreted as a contract between the company and any of its staff members." Dkt. No. 32-8, p. 19. In the absence of evidence suggesting that plaintiff's employment was anything other than at will, defendants are entitled to summary judgment dismissing plaintiff's breach of contract claim.

## IV.     CONCLUSION

For these reasons, it is

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 32) is **GRANTED**; and it is further

**ORDERED** that plaintiff's Title VII, NYSHRL and breach of contract claims are **DISMISSED with prejudice**; and it is further

**ORDERED** that to the extent not previously dismissed, the second, third, fourth, fifth and sixth causes of action are **DISMISSED with prejudice**; and it is further

**ORDERED** that the Clerk of the Court is directed to dismiss the complaint (Dkt. No. 1) and close this case.

**IT IS SO ORDERED.**

February 25, 2015
Syracuse, New York

*Brenda K Sannes*
Brenda K. Sannes
U.S. District Judge